# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ANDOVER HEALTHCARE, INC.,

                Plaintiff,

v.                                 Civil Action No. 13-843-LPS

3M COMPANY,

                Defendant.

Arthur G. Connolly, III, Ryan P. Newell, and Mary I. Akhimien, CONNOLLY GALLAGHER LLP, Wilmington, DE.

David Brafman, Peter A. Chiabotti, Patricia Carlson, and Amy Price, AKERMAN LLP, West Palm Beach, FL.

    Attorneys for Plaintiff.


Jack Blumenfeld, Maryellen Noreika, and Jeremy A. Tigan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.

Michael A. Morin, Mark J. Feldstein, and Casey L. Dwyer, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, DC.

M. David Weingarten, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Atlanta, GA.

Justin A. Hendrix, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Palo Alto, CA.

    Attorneys for Defendant.

## MEMORANDUM OPINION

May 11, 2015
Wilmington, Delaware

STARK, U.S. District Judge:

Plaintiff Andover Healthcare, Inc. ("Andover" or "Plaintiff") filed a patent infringement action against Defendant 3M Company ("3M" or "Defendant"). (D.I. 1) Andover asserts U.S. Patent No. 6,156,424 ("the '424 patent" or "the patent-in-suit") against 3M. (*Id.*)[1]

Pending before the Court is the issue of claim construction of various disputed terms of the patent-in-suit. The parties completed briefing on claim construction on November 4, 2014. (D.I. 84, 85, 100, 102) In addition to the briefing, the parties submitted technology tutorials. The Court held a Markman hearing on March 6, 2015. ("Tr.")

I. **LEGAL STANDARDS**

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a

---

[1] The '424 patent is entitled "Cohesive Products." It was issued on December 5, 2000. (D.I. 78, Ex. 1)

claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481

F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and

3

testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## II. CONSTRUCTION OF DISPUTED TERMS

### A. "cohesive"

| |
|---|
| **Andover** sticks to itself rather than to other materials such as skin and hair |
| **3M** sticks to itself and not to other materials |
| **Court** sticks to itself and not (at least to any significant degree) to other materials |

As a preliminary matter, the parties disagree about whether the Court must construe "cohesiveness" as well as "cohesive." 3M proposes that the Court do so, although it provides no separate construction for "cohesiveness." The Court sees no need to separately construe

4

"cohesiveness" – although the parties will not be permitted to present evidence or argument to the jury that "cohesiveness" means anything other than the noun form of "cohesive."

The parties' primary dispute is whether "such as skin and hair" should be added to the rest of the agreed-upon definition for clarification. Andover requests such clarification based in part on the specification's explanation that "because the synthetic elastomers are cohesive, rather than pressure sensitive, the surface of tapes 10, 40 will not stick (at least to any significant degree) to other surfaces or materials" ('424 patent at col. 3 ll. 51-61), whereas 3M finds Andover's additional phrase to be unduly narrowing, especially given the specification's statement that "[n]atural rubber latex is inherently cohesive, meaning that it sticks to itself rather than to other materials" (*id.* at 1 ll. 15-17).

Andover supports its proposed construction by pointing, first, to the specification. (*See* '424 patent, col. 1 ll. 3-4 ("This invention is directed to cohesive products, and more particularly to cohesive tapes and bandages . . . ."); *id.* col. 1 l.9 to col. 2 l. 9 (referring repeatedly to cohesive bandage and tape); *id.* col. 3 ll. 54-61 (referring to tape sticking to its own surfaces when wrapped around an ankle but not to other surfaces)) Andover further cites to a prior art patent listed in '424 patent, which itself refers to cohesive products sticking to themselves but not to skin, hair, or garments. (*See* D.I. 78, Ex. 3 at col. 1 ll. 8-19)

In response, 3M observes that the '424 patent's specification states that "tape or bandage" are merely exemplary embodiments (*see* '424 patent, col. 4. ll. 9-13) and, moreover, that the only claims directed specifically to bandages – for which the skin and hair clarification would be of particular relevance – were cancelled during prosecution (*see* D.I. 84, Ex. O at 21-25; *see also* D.I. 100, Ex. U at 75:22-80:20 (Andover's expert explaining that his opinion regarding skin and

5

hair is in context of bandages)).

"Even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). Here, Andover has not demonstrated a clear intention to limit the claim scope. Although the patentee explained that "a cohesive material is one that, as a practical matter, *adheres only to itself*," it expressly qualified this statement with a quote from the specification: "a cohesive product [] will adhere to itself, but not *(at least to any significant degree)* to other substrates." (D.I. 84, Ex. A at 10 (citing '424 patent at col. 7 ll. 36-38)) (emphasis added) The patentee further explained that, in contrast to a cohesive material, "[a]n *adhesive*, on the other hand, will adhere not only to itself, but also to *other and quite different materials*." (D.I. 84, Ex. A at 10) (first emphasis in original; second emphasis added) More recently, in its Preliminary Response to the Petition for IPR, the patentee stated that "[t]he inventor of the '424 Patent acted as his own lexicographer by defining and consistently using 'cohesive' in the specification to mean 'adhere[s] to itself, but not (at least to any significant degree) to other substrates.'" (D.I. 84, Ex. E at 8)

The Court is not persuaded by 3M's extensive reliance on prosecution history for a related, European patent. There simply is no clear and unambiguous disclaimer.

Accordingly, the Court adopts 3M's proposed construction of this term with the added clarification of "at least to any significant degree" (a phrase Andover also suggested at the hearing).

6

## B. "synthetic"

| Andover |
|---|
| does not contain natural rubber latex |
| **3M** |
| Plain and ordinary meaning, or in the alternative, produced by synthesis, not of natural origin. |
| **Court** |
| produced by synthesis, not of natural origin |

The parties disagree about whether this term should be limited to excluding natural rubber latex, as proposed by Andover, or given its plain and ordinary meaning, as proposed by 3M. Alternatively, 3M proposes a definition of "synthetic" which reflects dictionary definitions of the term. (*See* D.I. 84, Ex. P at 1377; D.I. 84, Ex. Q at 987; D.I. 84, Ex. R at 1197)

Andover points out that the purpose of the invention distinguishes it from prior art using natural rubber latex (*see* '424 patent, col. 1 ll. 3-6), and that the specification repeatedly contrasts synthetic materials and natural rubber latex (*see id.* col. 1 ll. 42-49, col. 2 ll. 10-13). Andover further argues that if "synthetic" excludes natural materials other than natural rubber latex, then a claimed embodiment would be excluded. According to Andover, because claim 3 states that the "synthetic water-based cohesive comprises . . . an elastomer . . . [and] at least one tackifying agent" (*id.* col. 12 ll. 58-64), and the specification explains that the tackifying agent "includes . . . naturally occurring rosins" (*id.* col. 6 ll. 58-62), it follows that naturally occurring materials other than rubber, such as rosins, cannot be excluded by the term "synthetic."

The Court disagrees with Andover. Because the synthetic cohesive in claim 3 comprises both an elastomer and a tackifying agent, it is "synthetic" as long as either the elastomer or the tackifying agent are synthetic. In other words, the inclusion of a naturally occurring material with a synthetic material does not render the resulting combination natural.

7

As 3M emphasizes, the term "synthetic" in the specification is not limited to the synthetic cohesive, but is also used to describe the substrates. (*See id.* col. 4 ll. 9-13 ("In embodiments in which the cohesive product of the present invention is a tape or bandage, the substrate typically will comprise a . . . fabric such as a non-woven scrim, of either natural or synthetic fiber.")) It would be odd, then, to limit the meaning of "synthetic" just to how the term is used in association with cohesives.

Accordingly, the Court will adopt the plain and ordinary meaning of "synthetic" in the context of the '424 patent, which the Court concludes is accurately reflected in the alternative construction proposed by 3M.

### C. "comprising" / "comprises"

| |
|---|
| **Andover** <br> including but not limited to / includes but is not limited to |
| **3M** <br> Plain and ordinary meaning. |
| **Court** <br> Plain and ordinary meaning. |

At the hearing, Andover agreed with 3M that jury instructions would suffice to give this term its meaning of "including but not limited to." (Tr. at 26) Accordingly, the Court does not need to construe this term.

### D. "an elastomer having an inherently crystalline structure" / "elastomer inherently capable of crystallization" / "inherently crystalline elastomer"

| Andover |
|---|
| an elastomer that crystallizes (forms ordered structures within an otherwise amorphous mass) when the elastomer is in its natural form and is within a temperature range particular to the elastomer / an elastomer that forms ordered structures within an otherwise amorphous mass when the elastomer is in its stable, natural form[2] |

| 3M |
|---|
| the elastomer material used to make the cohesive product, when in its natural form, exhibits a stable crystalline structure |

| Court |
|---|
| an elastomer that forms ordered structures within an otherwise amorphous mass when the elastomer is in its stable, natural form |

The parties agree that all three versions of this term should be construed synonymously. The specification provides an express definition for an inherently crystalline structure: "As used herein, 'inherently crystalline' or 'inherently capable of crystallization' means that a material exhibits a microcrystalline, polycrystalline, or crystalline-like structure in a stable, natural form." ('424 patent, col. 5 ll. 18-22) The material involved in the disputed terms is an elastomer. However, because "microcrystalline" does not appear in the claims, Andover proposes replacing "exhibits a microcrystalline, polycrystalline, or crystalline-like structure" with "forms ordered structures within an otherwise amorphous mass," consistent with its proposed construction of "crystalline structure." (Tr. at 28-29) For reasons the Court will explain below, it is adopting Andover's proposed construction of "crystalline structure."

Accordingly, the Court construes the terms in dispute as "an elastomer that forms ordered structures within an otherwise amorphous mass when the elastomer is in its stable, natural form,"

---

[2]Andover proposed this alternative construction at the hearing. (*See* Tr. at 32)

9

which is the proposal Andover made at the hearing.

### E. "crystalline structure" / "crystalline"

| **Andover** |
|---|
| ordered structures which develop within a mass of otherwise amorphous material |
| **3M** |
| having ordered crystal structures observable under magnification of thin films of material |
| **Court** |
| ordered structure which develops within a mass of otherwise amorphous material / having an ordered form which develops within a mass of otherwise amorphous material |

The parties disagree about whether "crystalline structure" or "crystalline" should be construed. Because neither party disputes that "structure" can be understood through its plain and ordinary meaning, the Court will only construe the adjective "crystalline."

Andover points out that 3M's definition is based on the specification's explicit definition of *micro*crystalline, which the specification distinguishes from crystalline. (*See id.* col. 5 ll. 8-16 ("As applied to polymers, the terms crystalline, microcrystalline, and polycrystalline refer to ordered structures which develop within a mass of otherwise amorphous polymeric material. Certain polymers such as isotactic polypropylene develop a highly organized microcrystalline structure due to the inherent structure of the polypropylene. The term microcrystalline, as used herein, refers to ordered structures that can be observed under magnification of thin films of polymer.")) 3M contends that the observability limitation placed on microcrystalline should be imported into the term crystalline simply because a microcrystalline is smaller than a crystalline, and therefore a crystalline must also be observable under magnification. Regardless of whether this is factually correct – which Andover disputes, based on a book explaining that a type of "crystalline microstructures" called "spherulites" may actually be larger than certain "crystalline

10

regions" (*see* D.I. 102, Ex. B at 41-43) – the claim language does not support limiting crystalline structures to those which would be observable under magnification.[3]

Accordingly, the Court adopts Andover's proposed construction.

### F. "a cohesive elastomeric solid"

| Andover |
|---|
| Does not need construction. If construed: a solid material that is cohesive and made from an elastomer. |

| 3M |
|---|
| a cohesive elastomer in a partial polycrystalline state |

| Court |
|---|
| a solid material that is cohesive and made from an elastomer |

The parties appear to be in agreement that "cohesive" and "elastomer" do not need further construction, but 3M urges that the combination of these terms into "a cohesive elastomeric solid" should be construed to include the limitation of "in a partial polycrystalline state."

3M argues that, during prosecution, Andover disclaimed cohesive elastomers that are not in a partial polycrystalline state, by telling the Examiner: "Applicant has found that cohesiveness and crystallinity are related, i.e. that the cohesive property depends on an elastomer being in a stable crystalline-like state." (*See* D.I. 84, Ex. A at 6) However, as Andover points out, this

---

[3] 3M also argues that failing to specify that the crystalline structures are observable under magnification makes it impossible to differentiate between structures that are sufficiently crystalline and those that are not, because Andover's expert, Dr. Storey, explained that other detection methods may detect levels of crystallinity that would be excluded in the context of elastomers. (*See* D.I. 100, Ex. U at 10:16-18:8) This, 3M contends, would render the claims indefinite under *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2123 (2014) ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them, in a manner that avoids a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims."). However, particularly given the competing expert opinions in the record, the Court concludes that 3M has failed to prove, by clear and convincing evidence, that the claim is indefinite.

11

statement was not made with regard to the asserted claims, but rather with regard to claims that were ultimately rejected (*see* D.I. 102, Ex. G), and, in any case, "Andover's expressed understanding of the science that enables the cohesive property are not words of 'manifest exclusion or restriction' amounting to an express disavowal of claim scope" (D.I. 102 at 84).

Andover further contends that because the "in a partial polycrystalline state" limitation appears in claims 3, 4 and 5 but not claim 6, it cannot be read into claim 6. Andover buttresses this argument by noting that claim 5 also includes "a cohesive elastomeric solid," which, if construed to include "in a partial polycrystalline state," would make redundant the explicitly included limitation of "in a partial polycrystalline state" in that claim. (*See* '424 patent, col. 13 l. 12 to col. 14 l. 4) The Court finds this adds support to Andover's proposed construction.[4]

Accordingly, the Court construes this term as "a solid material that is cohesive and made from an elastomer."

## IV. CONCLUSION

The Court will construe the disputed claim terms of the patents-in-suit consistent with this Memorandum Opinion. An appropriate Order follows.

---

[4]3M also contends that there is no written description or enabling support in the specification for a cohesive elastomer that is not in a partial polycrystalline state. The Court finds that 3M has not met its burden to show, by clear and convincing evidence, that written description or enabling support is lacking absent adoption of 3M's proposed construction of "in a partial polycrystalline state."

12